UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CHRISTOPHER DEHMER,
   Plaintiff,

vs.                                   No. 07-1218,

J.C. ZUERCHER, et. al,
   Defendants.

## SUMMARY JUDGEMENT ORDER

This cause is before the court for consideration of the defendants' motion for summary judgement [d/e 36].

### I. BACKGROUND

The pro se plaintiff filed this complaint pursuant to *Bivens v Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971) claiming his constitutional rights were violated at the Federal Correctional Institution in Pekin, Illinois. The plaintiff has the following surviving claims: Defendants Warden J.C. Zuercher, Lieutenant Troy Fardel and Officer John Doe(s) violated the plaintiff's First Amendment Freedom of Association and Fifth Amendment Due Process rights when they used ion spectrometry to repeatedly deny the plaintiff visitation. September 22, 2008 Merit Review Order.

### II. FACTS

The Bureau of Prisons (herein BOP) implemented an Ion Spectrometry Program on February 24, 2005. The Program Statement says its purpose is to limit the amount of illegal substances entering federal prisons in a "minimally intrusive method for screening people." (Def. Facts, Ex. B, p. 2)

The Program Statement includes appointing and training managers and operators, scheduled maintenance, equipment settings and specific testing procedures. (Def. Facts, Ex. B) The test is performed by waiving a hand held device over an individual's hands, pant pockets, waist area, pants cuff and personal identification. The operators are instructed to conduct tests randomly and based on reasonable suspicion.

The Program Statement directs that if a person tests positive for the presence of narcotics, the operator is to immediately retest the individual to confirm the results. If the test is still positive, the individual is prohibited from visiting for 48 hours. The program then increases the number of days a person is prohibited from visiting for subsequent positive test results: second

positive- 30 days; third positive- 90 days; and fourth positive- 180 days.(Def. Facts, Ex. B, p. 16) Operators are required to explain the test results and consequences to the visitor and inform them how to appeal.

The BOP Employee Services Manger states that Jerome Zuercher was the Warden at FCI Pekin from December 10, 2006 to October 26, 2008.

Troy Fardel say he has been employed at FCI Pekin as a lieutenant for 10 years. Fardel says he had no direct involvement in any decision to deny visitors to the plaintiff on April 24, 2006; June 9, 2006 and September 8, 2006, because he did not work at FCI Pekin on these days. (Def. Facts, Fardel Aff, p. 1)

Fardel says on March 13, 2006 and October 23, 2006, he worked from 4:00 p.m. to 12:00 a.m. Since visitation ended on these days at 3:00 p.m, Fardel says he was not involved in any decision to deny visitation. Fardel says it is possible he may have been on duty when the plaintiff was denied visitation on March 12, 2006; March 31, 2006; April 21, 2006; October 13, 2006 and October 23, 2006. On April 10, 2008, BOP suspended the use of the ion spectrometry device at Pekin Correctional Center.

The plaintiff says in his deposition that he entered FCI Pekin in January of 2006. The plaintiff was incarcerated due to a drug offense. The plaintiff says his mother visited him at least once a month and had already visited him at FCI Pekin a couple of times before she first tested positive on March 31, 2006. Two other individuals who traveled with the plaintiff's mother from Rockford, Illinois, were still allowed to see the plaintiff. (Def. Fact, Ex. A, p. 18-19).

After the plaintiff's mother first tested positive, she wrote a letter to the Office of Inspector General complaining that she had been denied visitation. On April 21, 2006, she was again denied visitation after a positive test result. The plaintiff believes his mother was informed of how she could appeal the decision. (Def. Fact, Ex. A, p. 30)  His mother then received a letter from Warden Veach in response to her complaints about the Ion Spectrometer explaining the use of the device.

On June 9, 2006, the plaintiff's mother was denied visitation again after she tested positive for the presence of an illegal substance. On that day, other family members were allowed to visit the plaintiff. (Def. Fact, Ex. A, p. 39-40).

After this denial, the plaintiff's mother was allowed to visit on several occasions until she tested positive for a fourth time on May 22, 2007. The plaintiff says his mother was not allowed to visit for six months, but has been visiting regularly without incident since November of 2007. (Def. Fact, Ex. A, p. 42).

The plaintiff's father tested positive for the presence of an illegal substance on three occasions.   The plaintiff does not believe his father appealed those results. (Def. Fact, Ex. A, p.

43-45). The plaintiff's father resumed visitation with the plaintiff and tested positive a third time on October 23, 2006. The plaintiff does not remember the date, but says on one occasion his father was allowed to visit even though he had a positive test result. (Def. Fact, Ex. A, p. 47, 48). The plaintiff says his father is an air traffic control specialist and has served with the federal government for 35 years.

The plaintiff says both his mother and his father at times used his mother's 1999 Cadillac to drive from Rockford to visit him. The plaintiff admits he used that same car when distributing cocaine and admits his family might have come into contact with residue cocaine in the vehicle. (Def. Fact, Ex. A, p. 20-22).

The mother of the plaintiff's child tested positive for the presence of illegal substances on three occasions. After the final test on September 8, 2006, she was excluded from visiting for 90 days, but then resumed visiting the plaintiff without further problems. (Def. Fact, Ex. A, p. 51-52).

The plaintiff admits that while he was in FCI Pekin he was found guilty of possession of marijuana. On September 10, 2008, a disciplinary hearing was held and the plaintiff admitted he had marijuana. (Def. Fact, Ex. A, p. 64)

### III. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56c. Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## IV.  ANALYSIS

The defendants argue that the plaintiff cannot demonstrate a violation of his constitutional rights under either the First or Fifth Amendment. Prisoners obviously lose many of the "liberties and privileges enjoyed by other citizens" and clearly "freedom of association is among the rights least compatible with incarceration." *Overton v Bazzetta,* 539 U.S. 126, 131 (2003). While the Supreme Court has addressed the issue of visitation, it has not determined "the extent to which it survives incarceration." *Id* at 132. Therefore, while some courts have noted the importance of allowing reasonable visiting opportunities, " locating a constitutional anchor for it is a formidable task." Michael B. Mushlin, 2 *Rights of Prisoners* §12.2 (3rd Ed. 2008).

The Seventh Circuit has recognized that prisoners still have a right to associate with close relatives. *Mayo v. Lane*, 867 F.2d 374, 375 (7th Cir.1989) ("The concept of liberty in the Fourteenth Amendment has been held to embrace a right to associate with one's relatives."). Some courts have found that prison visitation may also be protected by the First Amendment right of association. *See Brisbon v. Lane,* 554 F. Supp. 426, 428 (N.D.. Ill. 1983); *Morgan v. DeRobertis,* 582 F.Supp. 271, 273 (N.D. Ill. 1984)*.* However, these rights are not absolute*. Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). Prison officials may impose restrictions on inmates' visitation rights as long as the restriction is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89(1987).

Whether a regulation is reasonable depends on whether (1) a valid, rational connection exists between the regulation and a legitimate governmental interest; (2) the prisoner has available alternative means of exercising the right in question; (3) accommodation of the asserted right will have negative effects on guards, inmates or prison resources; and (4) there are obvious, easy alternatives at a minimal cost. *Id*. at 89-91.

> As an initial matter, plaintiff bears the heavy burden of proving that the regulation is unreasonable. Courts are required to give substantial deference to the judgment of prison officials who have the responsibility of determining the legitimate goals of the institution, and determining the most appropriate means to accomplish those goals. Therefore, plaintiff must show that the interests defendant cites are irrational or that the regulation is not rationally related to defendant's stated interests. *Phillips v Thurmer,* 2009 WL 1252002 at 4 (W.D.Wis. Apr. 30, 2009)

The defendants argue they have a legitimate penological interest in using trace drug detection. The stated purpose for using the Ion Spectrometer to scan visitors is to cut down on the availability and use of illegal substances by federal prison inmates. The "unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." *Block v Rutherford,* 468 U.S. 576, 588-89 (1984). The plaintiff even admits that he was found with marijuana while he was incarcerated.

The defendants further argue that the Ion Spectrometry Device was considered to be a minimally intrusive way to accomplish this goal. In addition, the operation of the device was controlled by specific procedures which allowed for any visitor to appeal if they received a positive test. Furthermore, even if the contact visitation was suspended, it was temporary, and inmates could still communicate with relatives by telephone or mail. In the plaintiff's case, the defendants say he still had the opportunity to communicate with friends and family members by telephone or mail.

The plaintiff claims that several times his family members were denied visitation because the Ion Spectrometer was malfunctioning. (Def. Fact, Ex. A, p. 26-27). However, the plaintiff provides no specific evidence to support this allegation.

The plaintiff also argues the use of the Ion Spectrometry Device was "arbitrary and capacious." (Plain. Memo, p. 5) Nonetheless, the plaintiff has not demonstrated that any defendant failed to use the ion spectrometer in a proper way when screening his visitors or that the device was somehow used differently with his visitors. The plaintiff also admits his visitors had an opportunity to appeal any positive test result.

The plaintiff finally points to a Ninth Circuit case which questioned the probative value of dog alerts on large sums of currency "due to the contamination of America's paper money supply with narcotic residue." *U.S. v. U.S. Currency,$30.060,* 39 F.3d 1039, 1042 (9th Cir. 1994). The court finds that this case is not relevant to the issues before this court since it concerns the use of drug detector dogs, paper money and the seizure of that money. None of these facts are at issue in the case before the court. *See also U.S. v Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars,* 403 F.3d 448, 469 (7th Cir. 2005)(found alert by drug detector dog was strong probative evidence).

The defendants have demonstrated a valid penological reason for the use of the Ion Spectrometer to scan the plaintiff's visitors. The test is minimally intrusive and the plaintiff had alternative means to visit with his family and friends. In addition, any limitation on visitation was temporary and a positive screen could be appealed. Based on the record before the court, the motion for summary judgement is granted.

**IT IS THEREFORE ORDERED that:**

**1) The defendants' motion for summary judgment is granted. [d/e 36].  The Clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56.  The case is terminated.  The parties are to bear their own costs.**

**2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  See Fed. R. App. P. 24(a)(1)c.  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g)**

**3) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available.  If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety.  The filing fee collected shall not exceed the statutory filing fee of $350.00.**

**4) The plaintiff is responsible for ensuring the $350.00 filing fee is paid to the clerk of the court even though his case has been dismissed.  Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.  The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such change.**

**5)  The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 27th day of August, 2010.

\s\Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE